**In re Eileen B. POOLE a/k/a E.M. Poole, Debtor.**

**James ANDERSON, Plaintiff,**

**v.**

**Eileen B. POOLE, Defendant.**

**Bankruptcy No. 93–12285DAS.**
**Adv. No. 94–0891DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 8, 1995.

Eric L. Frank, Philadelphia, PA, for debtor.

Joseph A. Diorio, Philadelphia, PA, for plaintiff.

Christine C. Shubert, Trustee, Tabernacle, NJ.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

*A. INTRODUCTION*

The instant adversary proceeding and a related motion in the Debtor's main bankruptcy case present, at bottom, the issue of whether a debtor can have her Chapter 7 discharge challenged by a party who commences his efforts against her several months after the case has been closed, despite the fact that he received timely notice of the pertinent bankruptcy proceedings, but while he was incarcerated and allegedly under heavy medication. We determine that, while an incapacity may, hypothetically, be a valid exception to the strict time requirements for challenging a debtor's discharge under 11 U.S.C. § 727(d)(1), which we deem the only statutory vehicle to achieve the result sought by the Plaintiff at this juncture, the Plaintiff has not offered sufficient evidence to enable us to apply such an exception to the instant facts. In addition, we find insufficient substance to the Plaintiff's underlying claims to justify relief in any event. Therefore, no relief will be granted to the Plaintiff.

*B. FACTUAL AND PROCEDURAL HISTORY*

EILEEN B. POOLE ("the Debtor") filed a voluntary Chapter 7 bankruptcy case on April 16, 1993. After a meeting of creditors on June 18, 1993, the Trustee filed a no-asset report and the Debtor's Discharge Order was mailed to all creditors on her mailing matrix on August 20, 1993, all without incident. The case was closed on September 1, 1993.

On January 14, 1994, an individual identifying himself as JAMES ANDERSON ("the Plaintiff"), then a prisoner at the Montgomery County Correctional Facility, wrote a letter to the court claiming that he had proof that the Debtor has stolen articles of his valued at $284,685, per an attached itemized list, and had committed fraud in her bankruptcy case by failing to disclose same. This court advised the Plaintiff, in a responsive letter of January 27, 1994, that it could proceed to act on his claims only if he filed a formal motion to reopen the Debtor's case and revoke her discharge, supported with specific allegations. Two correspondences later, the Plaintiff forwarded a handwritten Statement of Claim to the court on February 11, 1994. He was continually advised to put his complaints in the form of pleadings forwarded to the clerk's office.

After a significant hiatus, the Plaintiff, on July 20, 1994, forwarded a motion to reopen the Debtor's case and revoke her discharge, a motion for appointment of free counsel, and a substantive pleading re-articulating his claims regarding possession of assets and fraud on the part of the Debtor to the clerk of the court (the Motion). After a hearing of August 18, 1994, this court entered an Order of August 19, 1994, which reopened the Debtor's case; appointed Joseph A. Diorio, Esquire ("Diorio"),[1] as his counsel; and continued the hearing on what we deemed his motion to revoke the Debtor's discharge until October 20, 1994. After a continuance of the October 20, 1994, date to December 15, 1994, the Plaintiff, per Diorio, filed the instant adversary proceeding ("the Proceeding") before us on November 4, 1994. In four Counts, the Complaint in the Proceeding seeks to (I) revoke the Debtor's discharge

1. Diorio volunteered for his assignment after we described the matters before us in open court. This court believes that it would have had the power to involuntarily appoint counsel for the Plaintiff, if necessary, to provide the Plaintiff with due process and equal protection of the law. *See Boddie v. Connecticut,* 401 U.S. 371, 374–80, 91 S.Ct. 780, 784–87, 28 L.Ed.2d 113 (1971); and L. Swygart, *Should Indigent Civil Litigants in the Federal Courts Have a Right to Appointed Counsel?,* 39 WASH. & LEE L.REV. 1267, 1275–88 (1982). *Cf. In re Fitzgerald,* 167 B.R. 689 (Bankr.N.D.Ga.1994) (recognizing bankruptcy court's power to appoint counsel under 28 U.S.C. § 1915(d) or its inherent judicial power, but declining to do so in that case because the claims of the movant were found to lack merit). Diorio's willingness to handle this difficult matter and the vigor and tenacity of his representation of the Plaintiff throughout was truly admirable. The court is deeply grateful to him for his efforts and his example to the bar.

based on the Plaintiff's claim that the Debtor obtained her discharge by fraud; (II) obtain the turnover to him of all the Plaintiff's property allegedly in the Debtor's possession; (III) obtain compensation from the Debtor in the amount of $120,000 for alleged lost wages; and (IV) revoke her discharge for failure to disclose her alleged interest in a certain business.

The Plaintiff was permitted to file the Complaint *in forma pauperis,* in accordance with this court's previous decisions in *In re Pemberton,* 148 B.R. 415, 416 (Bankr.E.D.Pa. 1992); and *In re Sarah Allen Home, Inc.,* 4 B.R. 724 (Bankr.E.D.Pa.1980) (GOLDHABER, CH.J.). *Cf. In re Koren,* 176 B.R. 740, 741–43 (Bankr.E.D.Pa.1995) (establishing standards that a party whose income, like that of the Plaintiff, is below the federal poverty guidelines, is eligible to file a Chapter 7 case *in forma pauperis* under a newly-created pilot program).

Later, we entered a writ of *habeas corpus ad testificandum* to allow the Plaintiff to be brought from prison for the trial, *see In re Hucke,* 127 B.R. 258, 265–66 (Bankr.D.Ore.), *aff'd,* 128 B.R. 675 (D.Ore.1991); *In re Bona,* 110 B.R. 1012, 1018–20 (Bankr.S.D.N.Y. 1990), *aff'd,* 124 B.R. 11 (S.D.N.Y.1991); and 1 COLLIER ON BANKRUPTCY, ¶ 3.01[7], at 3–118 (15th ed. 1994). Finally, we denied a motion of the Plaintiff requesting that the marshal service be commandeered to transport an allegedly recalcitrant witness, Brian Gross, to the trial, since we believe that obtaining what was in issue a bench warrant must be accomplished through the contempt procedure set forth in Federal Rule of Bankruptcy Procedure 9020 after proof of service of a proper subpoena and an actual failure to appeal.

The trial proceeded in orderly fashion on December 15, 1994. The Plaintiff submitted a Memorandum of Law at trial, arguing that the Debtor's wrongful conversion of the Plaintiff's property justified denial of her discharge and the dischargeability of her debt to the Plaintiff under 11 U.S.C. § 523(a)(6).

However, in the court's mind, the crucial issue was the timing of the Plaintiff's actions. To this end, it is significant to note that it was established at trial that, on May 28, 1993, the notice of the First Meeting of Creditors, required pursuant to 11 U.S.C. § 341, which designated a deadline for filing any challenges to the Debtor's discharge or dischargeability of any of her debts as August 17, 1994, was sent to all creditors listed on the mailing matrix. The Plaintiff was listed on the matrix with an address of Philadelphia Detention Center ("the PDC"). The Plaintiff testified that, at the time of dispatch of the notice, he was located at another Philadelphia correctional facility identified as "PIC" (the Philadelphia Industrial Correctional Center). However, he stated that he received this notice at PIC some time in late May or early June of 1993. At some indeterminate time thereafter, the Plaintiff borrowed $15.00 from another inmate and obtained a copy of the Debtor's bankruptcy schedules, which contains the alleged misstatements in which are the substance of his claims.

The Plaintiff and his treating prison psychologist, Dr. Carlton Payne, both testified that, at some indeterminate time in the summer 1993, and continuing until August 1993, as the upshot of certain complaints by the Plaintiff against his public defender, the Plaintiff was believed to be mentally ill and was being heavily medicated. Dr. Payne stated that the medication made the Plaintiff "lethargic" and sometimes incapable of formulating appropriate responses to questions.

After the completion of the trial, the court indicated that it believed that the Plaintiff, having apparently received notice of the Debtor's bankruptcy case in timely fashion, could proceed with the merits of the proceeding and his related motion only if he could succeed in meeting the standards for the revocation of the Debtor's discharge. The parties were ultimately accorded until January 6, 1995 (the Plaintiff), and January 13, 1995 (the Debtor), to submit post-trial briefs addressing, *inter alia,* the issue of the timeliness of this proceeding.

## *C. DISCUSSION*

Although the Plaintiff has been reluctant to concede the point, once a discharge has been entered in a debtor's favor, as is the

case in the instant factual setting, the only remedy available to a creditor or any other interested party to challenge the discharge or dischargeability of a certain debt, particularly if that party has not been omitted from or misidentified in the debtor's schedules and matrix, is to revoke the debtor's discharge pursuant to 11 U.S.C. §§ 727(d), (e). The text of 11 U.S.C. § 727(d), which is the particular Code Section of relevance here, provides as follows:

> On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—
>
> (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;
>
> (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee; or
>
> (3) the debtor committed an act specified in subsection (a)(6) of this section.

No violation of a specific court order or an improper invocation of the right against self-incrimination, the substance of § 727(a)(6), is in issue, eliminating the application of § 727(d)(3). Section 727(d)(2) addresses a situation where property is acquired by a debtor post-petition. *See In re Puente,* 49 B.R. 966, 968–69 (Bankr.W.D.N.Y.1995); and 4 COLLIER, *supra,* ¶ 727.15[4], at 727–111, which is not in issue here. What is pleaded, at least factually, and is, we believe, the sole actual issue before us, is whether the conditions of § 727(d)(1) can be proven to exist here by the Plaintiff. Under the requirements of that section, the Plaintiff must show that certain of the Debtor's actions were fraudulent and that the Plaintiff did not know of the Debtor's fraud until after the Debtor was granted her discharge.

Revocation of a discharge is a drastic measure that runs contrary to the Bankruptcy Code's general policy of giving Chapter 7 debtors a "fresh start." *See In re Bowman,* 173 B.R. 922, 924 (9th Cir. BAP 1994); *In re Magnuson,* 113 B.R. 555, 558 (Bankr.D.N.D. 1989); *In re Montgomery,* 86 B.R. 948, 956 (Bankr.N.D.Ind.1988); and *In re Tucci,* 81 B.R. 320, 325 (Bankr.E.D.Pa.1988). *See also Kokoszka v. Belford,* 417 U.S. 642, 645–46, 94 S.Ct. 2431, 2433–34, 41 L.Ed.2d 374 (1974). Accordingly, the Plaintiff has the burden of proving all of the requirements for revocation of discharge enumerated in § 727(d)(1). *See In re Jones,* 71 B.R. 682, 684 (S.D.Ill. 1987); *In re McElmurry,* 23 B.R. 533, 535 (W.D.Mo.1982); *In re Arianoutsos,* 116 B.R. 116, 118 (Bankr.N.D.Ill.1990); *In re Stein,* 102 B.R. 363, 367 (Bankr.S.D.N.Y.1989); *Puente, supra,* 49 B.R. at 968; and *In re Kirschner,* 46 B.R. 583, 586 (Bankr.E.D.N.Y. 1985).

The first element which the Plaintiff must prove is that the Debtor has acted in a fraudulent manner. Specifically, the debtor must have committed fraud in the procurement of the discharge which would have been sufficient to prevent the discharge from being granted. *See In re Edmonds,* 924 F.2d 176, 180 (10th Cir.1991); *Jones, supra,* 71 B.R. at 684; *Bowman, supra,* 173 B.R. at 925; *In re Emery,* 170 B.R. 777, 783 (Bankr. E.D.N.Y.1994); *In re Perryman,* 111 B.R. 227, 228 (Bankr.E.D.Ark.1990); and *In re Topper,* 85 B.R. 167, 169–70 (Bankr.S.D.Fla. 1988).

We have very serious doubts that the Plaintiff met the burden of establishing this substantive element. A review of the Debtor's schedules, as supported by the testimony at trial, indicates that the Debtor did list the Plaintiff as a creditor and did disclose that she had "clothing and furnishings belonging to James Anderson" in her possession. Since she was not claiming ownership of these items, there was no requirement that she value them on her schedules. Therefore, even if we gave the Plaintiff the full benefit of our considerable doubt that his property in the Debtor's possessions was valued at anything close to $250,000, we would be hard-pressed to find that the Debtor committed fraud which would have been sufficient to prevent a discharge by failing to disclose the

full value of the Plaintiff's property in her possession.

Furthermore, we must note at this juncture that the court seriously questions the Plaintiff's credibility on the issue of the value of this property and generally. Regarding his general credibility, we note that the Plaintiff's very name is an alias. His real name is James John Hendel. He testified that he has used and continues to use the name "Anderson" because of "some difficulties with my taxes." Although he has obviously continued to use this name after his disassociation from the Debtor, he attributed the use of this name to her. This recitation seems an unlikely attempt to scapegoat the Debtor for a matter clearly of the Plaintiff's own doing.

The Plaintiff lived with the Debtor for two years before he was arrested, convicted, and sentenced to a five to seventeen year prison term for an aggravated assault of the Debtor on November 6, 1992. In addition to displaying little remorse for his infliction of serious injuries to the Debtor, the Plaintiff's testimony reflected a good deal of anger at the Debtor for her changing her original intention to seek joint counselling and recommend his probation, and, instead, just before the trial, requesting that he receive the stiff prison sentence which was ultimately imposed against him. The entire proceeding appears to this court to be a thinly-veiled attempt of the Plaintiff to seek retribution from the Debtor due to his dissatisfaction with her crucial and unfavorable input regarding his sentence.

In addition to the instant conviction and the vaguely-described tax problems, the Plaintiff was also convicted of theft by deception in 1986. He has admittedly alienated his brother, a police officer, and is apparently not on the best terms with his only other sibling, a sister.

The values attributed to almost every entry on the list of the Plaintiff's alleged property retained by the Debtor amounting to over $250,000 are patently inflated. These include, for example, $23,700 in cash supposedly left in a nightstand; three watches valued at a total of $27,200; 43 dress suits valued at $700 each, for a total of $30,100; four briefcases valued at $3,600; and kitchenware valued at $6,000. Although these are the most outrageous examples, they are indicative of the delusions of grandeur or patent falsities which pervade the entire listing. It is noteworthy that the Plaintiff had no hard evidence that items of such values existed in the face of the Debtor's denials that she has more than ordinary clothing and personalty belonging to the Plaintiff in her possession. Since the Plaintiff estimated his total earnings in the five years preceding 1992 at $140,000, *i.e.*, less than $30,000 annually, it seems most unlikely that he would have had or possessed such a wealth of luxury items of the values of those claimed on his schedules.

With respect to the Debtor's continued possession of the Plaintiff's property, we highly recommend that she dispose of it. She has retained it because she believes that a state court judge hearing a protection from abuse case which she brought against the Plaintiff so advised her. We suggest that she arrange, through her counsel and Diorio, if possible, to return all of that property to the Plaintiff.

The foregoing is, however, only a suggestion. We do note that certain counts of the Complaint, particularly Count II, request an order that we direct the Debtor to turn over his property in her possession to the Plaintiff. We do not believe that such turnover relief may appropriately be obtained from a bankruptcy court against a debtor except in extraordinary circumstances, *see In re New York City Shoes, Inc.*, 84 B.R. 947, 959 (Bankr.E.D.Pa.1988); and *In re Munoz*, 83 B.R. 334, 338–39 (Bankr.E.D.Pa.1988), although we do recognize that the Debtor's discharge would not extinguish the Plaintiff's state law right to recover his property from her.[2]

2. With respect to the Counts in the Complaint remaining in addition to Count I, seeking to revoke the Debtor's discharge, and Count II, seeking the turnover of this property, there is Count IV, which was withdrawn at the commencement of the trial, and Count III. With respect to Count III, we find insufficient evidence of any promise of the Debtor to make any specific salary payments to the Plaintiff for his admitted leadership role in forming the parties'

In sum, we find that the Plaintiff has proven no fraud committed against the court by the Debtor which could support the first prong of the dual requirements of § 727(d)(1).

Assuming *arguendo* that this first prong were proven by the Plaintiff, it is patently clear that the second prong was not. For, even if the Debtor's actions are deemed to be fraudulent, revocation of discharge is only appropriate if the Plaintiff did not know of the alleged fraud until after the discharge was granted. *See, e.g., Edmonds, supra,* 924 F.2d at 180; *In re Zimmerman,* 869 F.2d 1126, 1128 (8th Cir.1989); *In re Powell v. First National Bank of Nashville, Arkansas,* 113 B.R. 512, 513 (W.D.Ark.1990); *McElmurry, supra,* 23 B.R. at 535; *Bowman, supra,* 173 B.R. at 925; *Emery, supra,* 170 B.R. at 782–83; *In re Richard,* 165 B.R. 642, 643 (Bankr.W.D.Ark.1994); *In re Ginsberg,* 164 B.R. 870, 876 (Bankr.S.D.N.Y.1994); *In re Ratka,* 133 B.R. 480, 483 (Bankr.N.D.Iowa 1991); *In re Barley,* 130 B.R. 66, 70 (Bankr. N.D.Ind.1991); *In re Meo,* 84 B.R. 24, 29 (Bankr.M.D.Pa.1988); and *In re Couch,* 54 B.R. 682, 684 (Bankr.E.D.Ark.1995). Some courts have further indicated that, when a creditor knows or should know of any possible fraudulent conduct, the creditor has a duty to establish a timely and diligent investigation of the facts to succeed in satisfying this prong. *See, e.g., Mid–Tech Consulting, Inc. v. Swendra,* 938 F.2d 885, 887–88 (8th Cir.1991); *Arianoutsos, supra,* 116 B.R. at 118–19; and *Stein, supra,* 102 B.R. at 367–68. It is clear that the Plaintiff failed to produce evidence that he did not have actual knowledge of the Debtor's alleged fraud prior to her discharge. Thus, we must conclude that this requirement is not met, even if we do not evaluate the level and quality of the Plaintiff's pre-discharge investigation of the Debtor.

It is undisputed that the Plaintiff received documents that evidenced what he claims were the manifestations of the Debtor's alleged fraud before the Debtor's discharge. In his own testimony, the Plaintiff admitted that he received the notice disclosing the date of the deadline for objecting to the Debtor's discharge or the dischargeability of his debt and obtained a copy of the Debtor's schedules before the August 17, 1993, deadline. The Plaintiff attempts to overcome the overwhelming force of these concessions by suggesting that, in his medicated state, he was incapable of understanding the Debtor's alleged fraud. There was testimony that the Plaintiff was "lethargic" and sometimes incapable of formulating appropriate responses to questions during the exact time period between the receipt of these bankruptcy documents and the discharge. Unfortunately for the Plaintiff, the evidence on this point was vague and not totally convincing, as was necessary to overcome the presumption that receipt of the requisite notice is all that is necessary to cause the deadlines recited therein to be totally effective. The Plaintiff's testimony indicates that at no time was he completely incapacitated. He testified that, after he received the notice, but before the discharge, he was able to understand that it was important that he borrow $15.00 and obtain the Debtor's bankruptcy schedules. Further, the Plaintiff testified that, prior to the end of August, his medication was discontinued. It is not clear whether this event occurred before or after the August 17, 1993, deadline ran.

If the Plaintiff had been able to prove that he was totally incapacitated and incapable of understanding the Debtor's alleged fraud or her bankruptcy papers during the pertinent period, these facts may have been sufficient to excuse the Plaintiff from making a filing until a short time after his incapacity ended, although our research did not yield any decisions in any jurisdictions which have ever recognized such an exception to the rule that the time deadlines are strictly construed. However, the instant facts indicate that the Plaintiff took no action to challenge the Plaintiff's discharge until he wrote the first of his letters to the court on January 14, 1994. Even if we considered this first letter

joint business venture, Sexton Associates. This business, which marketed tests of personal abilities and personality traits, apparently failed after the parties' separation. In any event, any liability of the Debtor to the Plaintiff from this venture would appear to be discharged in her bankruptcy in light of the Plaintiff's failure, in the Proceeding, to successfully attack the Debtor's discharge.

to be an "informal complaint" sufficient to toll the discharge/dischargeability limitations period from that point forward, *see In re Sherf,* 135 B.R. 810, 812–16 (Bankr.S.D.Tex. 1991); and *In re Pace,* 130 B.R. 338, 340 (Bankr.N.D.Fla.1991), this action came far too late. The Plaintiff's disability was admittedly removed as of August, 1993. No justification was provided for the Plaintiff's delay in taking any action between August 1993 and January 14, 1994. Even the gap between January 14, 1994, and the filing of formal pleadings on July 20, 1994, was unreasonably long and possibly disqualifying.

The Plaintiff cites one, easily distinguishable case in support of his contention that this proceeding was timely filed, *In re Main,* 157 B.R. 786 (W.D.Pa.1992). In *Main* the debtors correctly identified a creditor on their schedules, but, due to an insufficient address, the notice of the deadline for filing a dischargeability complaint was not received by the creditor. The Plaintiff seeks to draw an analogy from the facts of *Main* to those in this case in light of the fact that, when the notice was sent to the Plaintiff at the PDC, he was in fact at PIC. However, this analogy is completely destroyed by the fact that the Plaintiff admittedly received the notice at PIC. *Compare In re Smith,* 1993 WL 36035, slip at *2–*3 (Bankr.E.D.Pa. Feb. 9, 1993); and *In re Goldstein,* 123 B.R. 514, 518 (Bankr.E.D.Pa.1991), and cases cited therein (holding that a creditor's actual notice of a bankruptcy filing prior to the bar date for filing challenges to discharge or dischargeability eliminated any claim that lack of notice of the bar date justifies a late filing).

Thus, we find that the Plaintiff failed to satisfy the "lack of timely knowledge" prong of 11 U.S.C. § 727(d)(1). Satisfaction of this prong is essential to a successful § 727(d) action. We must agree with the statement that "[w]here the requesting party fails to sustain its burden of proving that it lacked knowledge of the fraud prior to the granting of the discharge, the cause of action should be denied." *Puente, supra,* 49 B.R. at 968.

*D. CONCLUSION*

For all of the reasons set forth herein, the Motion must be denied and the Proceeding must be dismissed in its entirety. An Order will be entered accordingly.